51 CCPA

**Application of Robert A. BOLLER.**
**Patent Appeal No. 7197.**

United States Court of Customs and Patent Appeals.
June 4, 1964.

---

See also 332 F.2d 387.

Stevens, Davis, Miller & Mosher, John H. Lewis, Jr., Donald G. Welsh, Washing-

ton, D. C. (Sherman J. Kemmer, Crystal, Minn., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and AL-MOND, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 73–76, 79–85 and 88 in application serial No. 743,026, filed June 19, 1958, for "Method of Producing Epoxy Resin Complexes and Products Derived Therefrom." Ten claims were allowed by the examiner.

The invention relates to water-soluble, film-forming, resinous compositions useful as coatings for refrigerators, stoves, sanitary equipment and the like. Such compositions, after being spread on the surface to be coated, are heat-cured to provide what is commonly known as "baked enamel" finish.

Appellant's composition consists essentially of three parts: (1) resin, (2) neutralizing agent, and (3) water. The specification describes the resinous portion of the composition as "intermolecular alkyd-epoxy complexes derived from alkyd materials and epoxidized derivatives of unsaturated compounds."[1] Typical acids used to make appellant's alkyds are "saturated and unsaturated long chain fatty acids" such as phthalic or maleic acids (or their anhydrides). Typical alcohols are butanediol and diethylene glycol. The neutralizing agent is ammonia or amines, defined infra.

[1] Alkyds are synthetic resins made by reacting mono- or poly-basic acids with polyhydric alcohols. Appellant's alkyds are made by a first acid-alcohol reaction followed by subsequent reaction of the resultant product with a "second polybasic anhydride." This produces a complex of high acid number, i. e., containing a large number of unreacted carboxyl groups, which groups are reactive to epoxy groups.

Epoxy materials are made by partial oxidation of unsaturated long chain oils to form oxirane (epoxy) groups ($-C \overset{O}{\overbrace{\phantom{xx}}} C-$). Such groups, highly reactive to carboxylic acid groups, provide the mechanism for cross-linking long chain acids with long chain oils.

The essence of the invention is stated in the specification thus (emphasis ours):

"It is still another object of the invention to provide improved water soluble, fatty acid modified resinous material wherein residual acidity, derived as a half-ester of a dibasic acid or anhydride thereof in a partially reacted condition, *is blocked temporarily,* but is *available for final reaction,* all in a water system, and is reactively associated with an oil based epoxy material, said material containing a water soluble *organic inhibitor which retards the reaction until inactivated or driven off by heating* the composition upon final application as a film, which composition in the form of a cured film, is non-yellowing upon excessive aging, flexible, tough and has improved adherence to metal, glass and other surfaces.

\*       \*       \*       \*       \*       \*

"For producing inter molecular complexes \* \* \* herein described \* \* \* the processing involves two procedural parts as follows:

"Part 1: In this part of the processing there is formed an oil-modified alkyd resin containing a monobasic acid, a poly-basic acid or anhydride, and a polyol in which a second polybasic anhydride is reacted with the previously reacted mono-basic acid-poly-basic acid-polyol complex so as to produce oil-modified resinous half ester material. These complexes are all of high acid \* \* \* [number], with retention of a carboxyl group or groups which are reactive with epoxy groups.

"Part 2: In the second part of the processing the oil-modified resinous-half ester complex material \* \* \* is reacted with a long chain fatty compound having internal oxirane [epoxy] oxygen. *This part of the reaction is not carried to completion, but is stopped by the addition of a neutralizing inhibitor and stabilizer, such as ammonia or an amine, pref-erably an alkyl amine,* wherein the alkyl radical contains 1 to 5 carbon atoms, for example triethyl amine. Further, in this part of the reaction, care is taken to guard against allowing the reaction between the complex of Part 1 and the epoxidized compound to go to completion, and to this end, the epoxidized compound and the inhibitor-neutralizer may be added step-wise in desired proportions on adequate stirring and cooling, because the reaction is exothermic.
\*   \*   \*

\*       \*       \*       \*       \*       \*

"The residual reactive neuclei [sic] of the complex remains blocked by the inhibitor-neutralizer, during storage and even in the completed paint or enamel. However, upon application as a film, and *upon heating,* the *inhibitor-neutralizer is driven off and a fluid reaction takes place in situ,* in the film. This reaction involves interreaction between neuclei [sic] of the alkyd-half ester and the epoxy compound, with resultant formation of the desired film having the aforesaid characteristics. This all takes place without fire hazard."

Claim 76 is representative:

"76. A water-soluble resinous composition comprising (1) a fatty oil modified alkyd resin (a) containing between 10% and 40% long chain fatty acid chains of 6 to 26 carbon atoms and (b) further modified with a polycarboxylic acid selected from the group consisting of polycarboxylic acids, polycarboxylic acid anhydrides and mixtures of the same in a partially reacted state having residual carboxyl groups of an acid value of about 40 to 120 and chemically combined through oxygen linkages with (2) a partially reacted long chain epoxidized fatty ester containing residual oxirane oxygen groups, each oxirane group forming a three-member heterogeneous ring with two adjacent carbon atoms within carbon chains, of about 8 to 26 carbon atoms, *the combination*

having (1) an acid value of between about 40 and about 120, a water miscibleorganic coupling solvent, water, and (2) *a volatile neutralizing agent for said residual carboxyl groups temporarily inhibiting further reaction between the unreacted portions of said alkyd and the epoxidized ester compound.*" [Emphasis ours.]

Claim 85 is drawn to a process of making appellant's composition, claim 88 to a "pigmented composition" containing appellant's resin. Insofar as is relevant to this appeal, claims 73–75 and 85 differ from claim 76 in reciting "neutralizing agent" rather than "*volatile* neutralizing agent" (emphasis ours). Claims 79–84 and 88, like claim 76, recite "volatile neutralizing agent."

The sole ground of rejection of all claims is failure to comply with 35 U.S.C. § 112 in that, as the board held, they are "*unduly broad* in the recital of the *neutralizing agent.*" (Emphasis ours.) No prior art is cited.

The examiner's position, as stated in his answer, is as follows (emphasis ours):

"The specification discloses only certain basic amines as acid neutralizing agents. It is not evident that all acid neutralizing means such as polyfunctional alcohols, epoxidized fatty esters and polyamines when employed to inhibit further reaction between the unreacted portions of the alkyd and the epoxidized compound will produce a water dilutable coating vehicle composition. It is well known in the art that such polyfunctional 'acid neutralizing agents' form complex reaction products with alkyd resins containing residual carboxyl groups.

\* \* \* \* \* \*

" \* \* \* the examiner remains of the opinion that these claimed [sic, claim?] terms ["neutralizing agent," "volatile neutralizing agent"] are *too broad and indefinite* and thus do not comply with the provisions of 35 U.S.C. 112 \* \* \*. The specification discloses only certain basic amines as acid neutralizing agents and the claims should be so limited. In regard to applicant's contention that functional terminology is permitted by 706.03(c) M.P.E.P. and 35 U.S.C. 112 in relationship to doing something with a step or means, that per se, is known to the art, or within the ability of one skilled in the art to provide equivalents, it is noted that paragraph 3 of section 112 makes no change in the established practice of rejecting claims as functional in situations such as the instant situation wherein the claims recite only a single means and thus encompass all possible means for preforming [sic] a desired function. 706.03(c) M.P.E.P.; Ex parte Bullock, 1907 C.D. 93."

Though the board sustained the rejection, it did not agree with the examiner's reasoning with respect to "functional terminology." It said (emphasis ours):

"The neutralizing of the alkyd resin acid groups until use of the composition is an essential feature of the invention. Appellant is, in our view, entitled to claim this feature in terms which are of a scope commensurate with his disclosure. The claims before us go clearly beyond that scope. *Even if this essential feature could properly be functionally defined, the claims do not state the whole function.* There is, for example, nothing in claim 76 reproduced above which requires that the neutralizing agent be one that will be removed by baking at any *particular temperature.* The limitation to 'a *volatile*' neutralizing agent does not point out the temperature at which it is volatile, which might be well above the usable range of baking temperatures. We note also that \* \* \* there is clear indication that there is criticality in this respect in the choice of the neutralizing agent. *We note that while the third paragraph of 35 U.S.C. 112*

*permits functional language it does not take precedence over the requirement in the second paragraph that the applicant particularly point out and distinctly claim the subject matter he regards as his invention.* We can see no justification in the present case for claims which define an essential part of the invention *in such broad terms* as those before us and will sustain the rejection."

We think the board's position is eminently clear[2] and that the sole issue before us is whether appellant's claims comply with the second paragraph of 35 U.S.C. § 112.[3] The propriety of using so-called "functional" language to define combinations, is not disputed[4] since, as the solicitor notes in his brief,

"The Board * * * recognized that functional language may be permitted by the third paragraph of 35 U.S.C. 112, but the decision expressly states that the rejection is based upon the second paragraph of that section. Hence, the contention that functional claiming is not per se objectionable lacks relevance to the issue."

We consider then the question of whether the claims are "unduly broad" so as not to "particularly point out and distinctly claim" the invention. Appellant's brief says:

"* * * applicant lists a number of suitable neutralizing agents, including 'ammonia, monoethanol amine, diethanol amine, morpholine, dipropyl amine, and di-isopropyl amine' * * *.

"Any chemist, upon reading appellant's description would be fully informed in respect of the agents which are to be used for the purpose. The same is true in respect of the temperatures at which the neutralizing agent is volatile."

Our review of appellant's disclosure makes it clear that the invention is a combination of chemical materials, one of which is a "neutralizing agent" for temporarily tieing up residual carboxyl groups to prevent them from reacting with residual epoxy groups prior to heat-curing. The neutralizing agent must perform not only a "neutralizing" function but must also be a material capable of being volatilized at resin curing temperatures.

■■ In the absence of prior art, we must assume that the concept of temporarily blocking acid groups of alkyd-epoxy complexes with volatile neutralizing agents prior to heat curing is new. This is a broad invention and, as noted by the board, appellant is entitled to claims commensurate with the disclosure. In re Sus, 306 F.2d 494, 49 CCPA 1301. Accordingly, we believe that appellant's disclosure, even though of a limited class of "volatile neutralizing agents," is sufficient to justify claims which define broadly a *volatile* neutralizing agent. Use of this term is commensurate with the breadth of the invention as disclosed. We think any chemist skilled in this art is fully apprised by appellant's disclosure of what the invention is and is taught how to use it. Appellant need not disclose every operative "volatile neutralizing agent."

■ We cannot agree with the board that the claims must recite at what temperature the neutralizing agent is volatile. Any temperature "criticality"

---

2. Appellant devotes a substantial portion of his brief to arguing (1) that functional language in claims is not *ipso facto* bad and (2) that the term "neutralizing" is not "indefinite" in the context of his disclosure. We consider both points moot since the board apparently agrees with appellant.

3. 35 U.S.C. § 112, second paragraph, reads:
"The specification shall conclude with one or more claims *particularly pointing out and distinctly claiming* the subject matter which the applicant regards as his invention." [Emphasis ours.]

4. See in this regard In re Fuetterer, 319 F.2d 259, 50 CCPA 1453, particularly under subheading "(a) Functionality."

to which the board alludes relates to *operativeness* of the agent and it is well settled that claims need not expressly exclude *possibly* inoperative examples. See In re Sarett, 327 F.2d 1005, 1019, 51 CCPA ——. Thus we reverse the rejection of those claims which specify that the neutralizing agent be "volatile."

We agree with the board, however, that the claims which recite "neutralizing agent" broadly without saying it is volatile do not comply with 35 U.S.C. § 112. Volatility is of the essence and in our opinion must be recited to "state the whole function" of the neutralizing agent.

The rejection of claims 73–75 and 85 is affirmed; the rejection of claims 76, 79–84 and 88 is reversed.

Modified.